IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| EMCASCO INSURANCE COMPANY AND EMPLOYERS MUTUAL CASUALTY COMPANY,<br><br>  Plaintiffs,<br><br>v.<br><br>VAN DYKEN DRILLING, INC.,<br><br>  Defendant. | CV-23-62-BU-JTJ<br><br>MEMORANDUM AND ORDER |

## I.   INTRODUCTION

Plaintiffs EMCASCO Ins. Co. and Employers Mutual Casualty Co. (collectively EMC) have filed a declaratory judgment action against Defendant Van Dyken Drilling, Inc. (Van Dyken). EMC seeks a declaration that they have no duty to defend or indemnify Van Dyken in an action that is pending in Montana's Eighteenth Judicial District Court (Underlying Action) in which Van Dyken has been named as a third-party defendant.

In the Underlying Action, plaintiffs Ricki Vallance and Tyler Stolz have sued their landlord, Dusty Bottom Ranch (DBR), alleging that DBR failed to properly install, test, and maintain a water well on their rental property, thereby

1

resulting in their water supply being contaminated with lead.  DBR, in turn, sued Van Dyken, by way of a Third-Party Complaint, alleging that to the extent the water well is contaminated with lead, Van Dyken's acts or omissions caused the contamination.

EMC insured Van Dyken under a Commercial General Liability policy (GL Policy) and a Commercial Umbrella Policy (Umbrella Policy).  The policy period for both insurance policies was June 1, 2016, through June 1, 2017, with both policies renewed for a subsequent policy period from June 1, 2017, through June 1, 2018.

The GL policy contains a "Lead Exclusion."  The Lead Exclusion precludes coverage for bodily injury or property damage arising from the ingestion of lead.  The Umbrella Policy provides commercial liability umbrella coverage above the GL Policy.  The Umbrella Policy contains the same Lead Exclusion as the GL Policy.

EMC also sold Van Dyken an endorsement under the GL Policy for "Limited Pollution Coverage." This coverage is entitled "Water Well Drillers Limited Pollution Coverage – "Work Site."

EMC has moved for summary judgment, and argues that neither the GL policy, including the Limited Pollution Coverage endorsement (LPCE), or the Umbrella Policy provide coverage to Van Dyken for the claims against Van Dyken

in the Underlying Action. (Docs. 23, 24 and 34). Van Dyken opposes the motion. (Doc. 29). The Court held oral argument on June 13, 2024.

## II. LEGAL STANDARDS

### A. Summary Judgment

Fed. R. Civ. P. 56 (a) provides a party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986*).* A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252 (1986).

Once the moving party meets its initial burden, the nonmoving party may not rest upon the mere allegations or denials of his pleading, but instead must set forth "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (citation omitted). The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255.

B. **Montana Law**

Where, as here, a declaratory judgment action is in federal court based on diversity jurisdiction, the propriety of granting declaratory relief is a procedural matter to which federal law applies, but the underlying substantive issues are governed by state law. *Paul Evert's RV Country, Inc. v. Universal Underwriters Ins. Co.*, 2016 WL 3277175, at *2 (E.D. Cal. June 14, 2016) (citation omitted). Thus, the Court applies Montana law to all substantive legal issues. *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

1. **Insurance Policy Interpretation**

It is well-settled in Montana that the interpretation of an insurance contract presents a question of law. *Scentry Biologicals, Inc. v. Mid-Continent Cas. Co.*, 319 P.3d 1260, 1264 (Mont. 2014). A court interpreting an insurance policy is to read the policy as a whole and, to the extent possible, reconcile the policy's various parts to give each meaning and effect. *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 403 P.3d 664, 668 (Mont. 2017). The court must interpret the terms of the "insurance policy according to their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Allstate Ins. Co. v. Wagner-Ellsworth*, 188 P.3d 1042, 1046 (Mont. 2008). In doing so, the court "may not rewrite the contract at issue but must enforce it as

written if its language is clear and explicit." *Id.*   If the terms of an insurance policy are ambiguous, however, that ambiguity must be strictly construed against the insurer. *Id.*   An "[a]mbiguity exists only when the contract taken as a whole or in its wording or phraseology is reasonably subject to two different interpretations." *Farmers Alliance Mut. Ins. Co. v. Holeman*, 961 P.2d 114, 119 (Mont. 1998) (citation omitted). Interpretative differences should be resolved from the viewpoint of a layperson untrained in law or in the insurance business. *Giacomelli v. Scottsdale Ins. Co.,* 221 P.3d 666, 672 (Mont. 2009).

The determination of whether insurance coverage exists is a two-step process. *United States Fire Ins. Co. v. Greater Missoula Family YMCA*, 454 F.Supp.3d 978, 981 (D. Mont. 2020).  The insured bears the initial burden "to establish that the claim falls within the basic scope of coverage." *Farmers Ins. Exch. v. Wessel*, 477 P.3d 1101, 1105 (Mont. 2020).  If the insured shows that the claim falls within the basic scope of coverage, then the burden shifts to the insurer to show that the claim is unequivocally excluded under an exception within the coverage. *Fire Ins. Exch. v. Weitzel*, 371 P.3d 457, 461 (Mont. 2016). Because exclusions from coverage "are contrary to the fundamental protective purpose of an insurance policy," they must be narrowly and strictly construed. *Greater Missoula Family YMCA*, 454 F.Supp.3d at 981 (quoting *Newman v. Scottsdale Ins. Co.*, 301 P.3d 348, 355 (Mont. 2013)).

### 2. **Duty to Defend**

Under Montana law, "the duty to defend arises when an insured sets forth facts that represent a risk covered by the terms of an insurance policy." *Farmers Union Mut. Ins. Co. v. Staples,* 90 P.3d 381, 385 (Mont. 2004). The duty to defend is independent from and broader than the duty to indemnify created by the same insurance contract. *Id.*  In other words, where the insured alleges facts, which if proven, would result in coverage, then the insurer has a duty to defend. *Plum Creek Marketing, Inc. v. American Economy Ins. Co.*, 214 P.3d 1238, 1247 (2009). When a court compares allegations of liability advanced in a complaint with policy language to determine whether the insurer's obligation to defend was "triggered," a court must liberally construe allegations in a complaint so that all doubts about the meaning of the allegations are resolved in favor of finding that the obligation to defend was activated. *Staples*, 90 P.3d at 385.  Unless there exists an unequivocal demonstration the claim against the insured falls outside of policy coverage, the insurer's duty is to defend the insured. *Id.* (citing *Insured Titles, Inc. v. McDonald*, 911 P.2d 209, 212 (Mont. 1996)).

### 3. **Duty to Indemnify**

While an insurer's duty to defend is triggered by allegations, "[an] insurer's duty to indemnify hinges not on the facts that the claimant alleges and hopes to prove but instead on the facts, proven, stipulated or otherwise established that

actually create the insured's liability." *State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 411 (Mont. 2013). The duty to indemnify "does not arise unless the policy actually covers the alleged harm." *Skinner v. Allstate Ins. Co.*, 127 P.3d 359, 364 (Mont. 2005) (citation omitted). "[W]here there remain unresolved relevant issues in the underlying case, inseparable from the issues presented in the declaratory judgment action, the duty to indemnify is not ripe for resolution." *Id.* at 363.

Ruling on a duty to indemnify before allowing the facts to be determined in an underlying action fails to be "a final adjudication on the indemnification issue," and instead results in "speculative advice, subject to possible amendment or nullification upon final resolution of the underlying case." *Am. Reliable Ins. Co. v. Vlieland*, No. CV 17-100-M-DLC, 2018 WL 1582551, at *3 (D. Mont. Mar. 30, 2018) (citation and quotation omitted.) Therefore, courts must caution against determining questions of indemnity until liability is established in the underlying proceeding. *Id.*

### III. DISCUSSION

EMC argues it does not owe Van Dyken a duty to defend or indemnify Van Dyken under the GL or UP Liability Policies because the "Lead Exclusions" in these policies precludes coverage for the claims asserted against Van Dyken in the Underlying Action. Van Dyken agrees that the Lead Exclusion in the GL and UP

7

policies exclude coverage for the claims against Van Dyken in the Underlying Action but argues that the LPCE does provide coverage for these claims. (Doc. 29 at 14).

Turning to the LPCE, two potential issues remain. The first is whether EMC has made an unequivocal demonstration that the claims against Van Dyken in the Underlying Action fall outside of the coverage the LPCE's Insuring Agreement provides. If yes, EMC owes no duty to defend. If no, the second issue is whether EMC has made an unequivocal demonstration that the LPCE's Prior Pollution Incident (PPI) Exclusion and/or the Products-Completed Operations Hazard (PCOH) Exclusion exclude coverage for the claims against Van Dyken in Underlying Action. If yes, EMC likewise owes no duty to defend Van Dyken for the claims asserted against it in the Underlying Action.

### A. **Whether EMC has made an unequivocal demonstration that the claims against Van Dyken in the Underlying Action fall outside of the LPCE's Insuring Agreement.**

EMC argues that a LPCE is generally designed to provide limited coverage for pollution-related incidents which are short, discrete, and attributable to a specific action or inaction. In this case, EMC argues that the LPCE's Insuring Agreement (EIA) contains specific temporal requirements that simply are not met. (Doc. 24 at 26-27).

The EIA provides in pertinent part:

**SECTION 1 -COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as compensatory damages because of "bodily injury" or "property damage" because of "environmental damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" because of "environmental damage" to which the insurance does not apply. We may, at our discretion, investigate any "pollution incident" and settle any claim or "suit' that may result.  But:

   (1) The amount we will pay for damages is limited as described in § III found in this endorsement; …

   b. This insurance applies to "bodily injury", "property damage" or "clean-up costs" caused by a "pollution incident" only if:

   (1) The "bodily injury", "property damage", or "clean-up costs" arise out of a "short-term pollution event". The "bodily injury" or "property damage" is caused by an "occurrence" that takes place at or from a "work-site" within the "coverage territory";

   a. Caused by "your work" while performing water well drilling operations; or

   b. Caused by "your work" which was not completed.

   (2) The insured's responsibility to pay damages because of "bodily injury" or property damage" is determined in a

         "suit" on the merits in the "coverage territory" or in a settlement we agree to.

In relation to the Underlying Action, EMC contends that this language does not provide coverage to Van Dyken because it clearly and unambiguously requires a "pollution incident" to trigger coverage.[1] EMC argues that section A.1.a. cannot be read independently from section A.1.b. Rather, EMC asserts that the language in A.1.a., stating the coverage is limited to instances "to which this insurance applies," requires the insured to consult A.1.b. to determine the specific circumstances to which the insurance applies. Accordingly, EMC claims that, under the plain language of the EIA, Van Dyken is only provided coverage for "bodily injury" or "property damage" caused by a "pollution incident" and then only if temporal requirements of A.1.b. are satisfied as well. EMC effectively asserts that the coverage A.1.a. affords is wholly dependent on A.1.b. (Doc 34 at 6). Therefore, per A.1.b., the coverage A.1.a. affords is only provided if the "bodily injury" or "property damage" arises out of a "short-term pollution event", caused by an "occurrence" that takes place at or from a "work site" and is either caused by the insured's work while performing water well drilling operations, or by the insured's work which was not completed. (Doc. 24 at 27).

---

[1] Pollution incident means the actual emission, discharge, release or escape of "pollutants" at or from a "work site" that results in "bodily injury", "property damage" or "environmental damage". (Doc. 1-2 at 64).

EMC further argues that the claims against Van Dyken in the Underlying Action do not meet the definition of a "short term pollution event."[2] As such, EMC argues, Van Dyken cannot meet the requirements of A.1.b., thereby precluding coverage under the EIA. Thus, EMC argues, it owes no duty to defend Van Dyken for the claims against it in the Underlying Action. EMC argues that its position is further supported by the fact that the limits of liability for the LPCE are based on "Each Pollution Incident." In other words, if there is no "pollution incident," there is no limit of liability and no coverage. (Doc. 34 at 6).

Van Dyken counters that the EIA provides coverage for "those sums that the insured becomes legally obligated to pay as compensatory damages because of "bodily injury" . . . because of "environmental damage".[3] Van Dyken argues that the Underlying Action alleges the injurious presence of lead, a pollutant in a water source, caused "bodily injury" and "property damage." Therefore, Van Dyken claims that it has met its burden to show the claims against Van Dyken in the Underlying Action fall within the EIA's scope of coverage, and the burden shifts to

---

[2] A "short term pollution event" is defined as a discharge, dispersal, release, or escape of "pollutants" and (a) begins during the policy period; (b) begins at an identified time and place; (c) end, in its entirety, at an identified time within 72 hours of the beginning of the discharge, dispersal, release, or escape of the "pollutants", (d) you notify us as soon as practicable but no more than thirty (30) days after its ending; (e) does not originate form an underground storage tank. (Doc. 1-2 p.65).

[3] Environmental damage means the injurious presence in or upon land, the atmosphere, or any water course or body of water of solid liquid, gaseous or thermal contaminants, irritants, or "pollutants" which directly results in any physical damage to tangible property"). (Doc. 1-2 at p. 64).

EMC to "unequivocally demonstrate" that no potential for coverage exists. (Doc. 29 at 10-11).

Van Dyken argues that EMC cannot meet this burden. Specifically, Van Dyken contends that EMC must establish the applicability of part A.1.b., which is a limiting clause that excludes coverage. (Doc. 29 at 17). Van Dyken disputes EMC's position that A.1.a. depends upon A.1.b. Rather, Van Dyken contends that A.1.a. *extends* coverage for "bodily injury" and "property damage" caused by "environmental damage," and part A1.b. merely *limits* coverage for "bodily injury, "property damage" or clean-up costs *caused by a "pollution incident." Id.* (emphasis added.) Therefore, the "pollution incident" limitation in A.1.b. does not unequivocally preclude the coverage A.1.a. affords to Van Dyken for "bodily injury" or "property damage" caused by "environmental damage." *Id*. Van Dyken asserts, in effect, that A.1.a. and A.1.b. prove independent and separable.

Citing *Fisher ex rel McCartney v. State Farm Mut. Auto Ins. Co.*, 305 P.3d.861, 866 (Mont. 2013), Van Dyken further points out that EMC, as the drafter of the policy, is responsible for its terms. (Doc. 29 at 19). As such, Van Dyken argues, EMC could have drafted the LPCE to extend coverage only to "bodily injury" and "property damage" caused by a "pollution incident" or excluded coverage for all environmental damage caused by a "pollution incident." (*Id.*). However, Van Dyken contends that EMC did neither. Instead, EMC drafted two

12

independent provisions, one granting coverage for "environmental damage" and the other limiting coverage already extended but only *in the event of a "pollution incident."* (*Id*. at. 19- 20) (emphasis added).

The Court agrees with Van Dyken. After carefully consulting the EIA, the Court concludes that EMC's interpretation of the EIA may be reasonable. However, this is not the test. The test is whether the EIA, taken as a whole, is subject to two different interpretations. The Court concludes that it is.

Van Dyken's interpretation that A.1.a. provides coverage separate and apart from A.1.b. is supported by the language EMC chose to employ in the EIA. Initially, in A.1.a., EMC agreed that it would "pay those sums that the insured becomes legally obligated to pay as compensatory damages because of 'bodily injury' or 'property damage' *because of 'environmental damage'* to which this insurance applies." (emphasis added.) The language of A.1.a. makes no reference, express or implied, to A.1.b. Next, EMC makes no mention of "environmental damage" in the limiting language of A.1.b. Rather, in A.1.b., EMC chose to limit its insuring obligation to those instances where "'bodily injury', 'property damage' or 'clean-up costs'" were *"caused by a 'pollution incident'* . . .." Furthermore, EMC's definition of "environmental damage" is different from its definition of a "pollution incident." Therefore, a reasonable insured could conclude that the coverage afforded in A.1.a. for damages "because of environmental damage" is not

13

limited by A.1.b.'s "caused by a 'pollution incident" language. It proves reasonable to conclude that A.1.and A.1.b can exist separately and are not interdependent or otherwise intertwined.

EMC, as the drafter of the policy, chose to use the term "environmental damage," rather than the term "pollution incident" in A.1.a.'s general coverage provision. To accept EMC's position that its general grant of coverage in A.1.a. for "'bodily injury' or 'property damage because of 'environmental damage'"" is restricted to a "pollution incident" based upon the limiting language of A.1.b, would require the Court to ignore or give no meaning to the "because of 'environmental damage'" language of A.1.a. The Court is precluded from engaging in such a broad construction of A.1.b's exclusionary language because coverage exclusions are narrowly and strictly construed under Montana law. *Newman*, 301 P.3d at 355.

Additionally, the Court is unpersuaded by EMC's argument that its interpretation of the EIA is reinforced by the fact that the limits of liability for such coverage are based on "Each Pollution Incident," and therefore without a "pollution incident there is no coverage." Such argument is belied by the fact that the Pollution Liability Aggregate Limit states that EMC will pay for the sum of "all damages because of all "bodily injury", "property damage" and

"environmental damage". (Doc. 1-2 p. 62). This language further compounds the ambiguity of the of the EIA.

Finally, Montana follows the "reasonable expectations doctrine," which provides that the "objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Fisher ex rel. McCartney*, 305 P.3d at 867 . The Court notes that EMC, in its EIA, uses the terms "because of 'environmental damage'" in A.1.a. and "caused by" a "pollution incident" in A.1.b. and "results in" … "environmental damage" in its definition "pollution incident." An insured could reasonably interpret these very similar terms to provide coverage for both "environmental damage" and a "pollution incident". Overall, EMC's narrow interpretation of the EIA is defeated by the construction of the EIA, when considered through the lens of the "reasonable expectations" of the insured. The Court itself was required to spend more than a considerable amount of time to determine that EMC's interpretation of Van Dyken's coverage may be reasonable.

In conclusion, the Court determines that the EIA is subject to two different reasonable interpretations. This ambiguity precludes EMC from unequivocally demonstrating that the allegations against Van Dyken in the Underlying Action fall outside of the coverage provided in A.1.a. of the EIA.

**B. Whether the LPCE's Prior Pollution Incident Exclusion and/or the Products-Completed Operations Hazard Exclusion exclude coverage for the claims against Van Dyken in the Underlying Action.**

EMC argues that even if the Court determines the EIA provides coverage to Van Dyken, the Prior Pollution Incident (PPI) and/or Products-Completed Operations Hazard (PCOH) exclusions nevertheless operate to exclude coverage. Specifically, EMC states the PPI exclusion bars coverage for "bodily injury" caused or contributed by any "pollution incident" that commenced prior to the GL Policy's effective date of June 1, 2017. EMC argues that Van Dyken drilled the well on May 16, 2016, and completed the well on May 31, 2016. Despite the fact that the well was connected to the home on October 2, 2017, EMC argues the "pollution incident" would have occurred at the time the well was drilled, which was prior to the inception of coverage. Under such logic, the PPI excludes coverage under the EIA, and EMC stands entitled to summary judgment. (Doc. 24 at 33-34).

EMC further contends that the PCOH exclusion, which excludes coverage for "bodily injury" or "property damage" included within the PCOH and arising out of an emission, discharge, release or escape of "pollutants" which originates away from any insured site," also excludes coverage for Van Dyken. (Doc 24 at 24). EMC states that the PCOH exclusion is applicable to projects after the work is finished and the projects is placed in the owner's control. (Doc 24 at 25)**.** EMC

16

contends that it is undisputed that Van Dyken completed the work on May 31, 2016, and thus any alleged lead contamination that originated from Van Dyken's work on the well was completed prior to pollution event. (*Id.*) EMC further argues that even if October 2, 2017, the date when Van Dyken connected the well, is considered as the source of lead contamination, the PCOH still precludes coverage because that work was completed, and no longer ongoing, prior to alleged lead poisoning. (Doc. 24 at 32).

Van Dyken counters that it disputes the completion of the drilling of the well itself constitutes completion of Van Dyken's work. It further contends there is a factual dispute as to when the lead contamination, if any, occurred. Therefore, it proves premature to resolve these factual issues and determine whether the PPI exclusion applies to absolve EMC of its duty to defend on summary judgment. (Doc 29 at 26).

Van Dyken also argues that the PCOH exclusion does not apply because EMC cannot establish the second prong of such exclusion. Specifically, EMC cannot establish that the damages alleged in the Underlying Action originated "away from any insured site." (Doc. 29 at 25).

The Court determines that whether these exclusions apply depends upon resolution of the factual disputes in the Underlying Action. Specifically, the fact finder in the Underlying Action must determine when, where, and what, if

anything, Van Dyken did or did not do. Only then can the determination be made as to whether the PPI and/or PCOH exclusions apply.

Similarly, the Court finds that question of whether EMC owes a duty to indemnify Van Dyken is not ripe for consideration. While an insurer's duty to defend is triggered by allegations, "[an] insurer's duty to indemnify hinges not on the facts that the claimant alleges and hopes to prove but instead on the facts, proven, stipulated or otherwise established that actually create the insured's liability." *Freyer,* 312 P.3d at 411. "[W]here there remain unresolved relevant issues in the underlying case, inseparable from the issues presented in the declaratory judgment action, the duty to indemnify is not ripe for resolution." *Vlieland*, 2018 WL 1582551 at *3 (citing *Skinner*, 127 P.3d at 364.)

EMC's motion in relation to its duty to indemnify is not ripe and justiciable at this time. The allegations in the Underlying Action are currently unresolved in a pending state court matter, and no facts have been established that create liability for Van Dyken on either the PPI exclusion or PCOH exclusion. The Court, exercising caution pursuant to Montana law, declines to determine questions of indemnity in the absence of a determination of liability in the underlying proceeding. *Vieland*, 2018 WL 1582551 at *3 (citations omitted).

IV. **CONCLUSION**

EMC has failed to unequivocally demonstrate that the claims against Van Dyken in the Underlying Action fall outside the EIA.  EMC has also failed to unequivocally demonstrate that either the PPI or PCOH exclusions exclude coverage for the claims against Van Dyken in the Underlying Action. Therefore, EMC owes a duty to defend Van Dyken.

Accordingly, EMC's Motion for Summary Judgement is **DENIED**.

DATED this 22nd day of July 2024.

_____
John Johnston
United States Magistrate Judge